IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TARA T.,[1]                                                                                  Case No. 6:23-cv-00278-JR

         Plaintiff,                                                   OPINION AND ORDER

         v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

         Defendant.

RUSSO, Magistrate Judge:

         Plaintiff Tara T. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND[2]

Born in December 1973, plaintiff alleges disability beginning May 12, 2018, due to chronic obstructive pulmonary disease, depression/anxiety, epilepsy, and fibromyalgia. Tr. 246, 250. Her application was denied initially and upon reconsideration. On November 17, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 36-61. On December 29, 2021, the ALJ issued a decision finding plaintiff not disabled. Tr. 13-30. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 15. At step two, the ALJ determined the following impairments were medically determinable and severe: "obesity and osteoarthritis of the bilateral knees." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 18.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light exertion work as defined in 20 C.F.R. § 404.1567(b) except:

> [She] could lift and/or carry 20 pounds occasionally and 10 pounds frequently [and] stand and/or walk for a total of about 6 hours and sit for a total of about 6 hours in an 8-hour workday with normal breaks; [she] would be limited to frequent climbing of ramps or stairs and occasional climbing of ladders, ropes, or scaffolds; [she] would be limited to frequent stooping [and] occasional kneeling, crouching, and crawling; [she] must avoid concentrated exposure to temperature extremes; [she]

---

[2] The record before the Court constitutes over 1400 pages, but with multiple incidences of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears in its entirety.

>would be limited to occasional, concentrated exposure to atmospheric conditions as defined in the Selected Characteristics of Occupations of the DOT; and [she] must avoid concentrated exposure to workplace hazards such as unprotected heights and operational control of moving machinery.

Tr. 18.

At step four, the ALJ determined plaintiff was capable of performing her past relevant work as a cashier. Tr. 28. Alternatively, at step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy that plaintiff could perform despite her impairments, such as small products assembler, mail clerk, and marking clerk. Tr. 29.

## DISCUSSION

Plaintiff argues the ALJ erred by discrediting her subjective symptom statements regarding her: (1) "need to elevate her legs due to lower extremity edema"; and (2) "heightened fatigue," which "results in periodic napping" and poses "safety concerns." Pl.'s Opening Br. 4 (doc. 13).[3]

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the

---

[3] Plaintiff also argues the ALJ erred regarding the state agency consulting sources – Peter Bernardo, M.D., and William Nisbet, M.D. Specifically, plaintiff contends the ALJ found the opinions of Drs. Bernardo and Nisbet generally persuasive "without reconciling how their determinations were remote in time and made prior to the development and diagnosis of [her] symptoms involving swelling of the extremities and chronic fatigue." Pl.'s Opening Br. 5-7 (doc. 13). However, plaintiff does not cite to any medical evidence in arguing for a more restrictive RFC, and her contention implicitly acknowledges that her edema and fatigue problems did not begin until well-after the application date. *Cf. Meadows v. Saul*, 807 Fed.Appx. 643, 647 (9th Cir. 2020) (ALJ "did not err in giving great weight to the [state agency consulting source] opinions" even though they "did not review any evidence beyond August 2014 . . . There is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in time"). Stated differently, although plaintiff putatively raises her appeal as a challenge to the ALJ's "physical RFC," she does not cite to any medical or other evidence except her own statements to establish additional limitations. Pl.'s Opening Br. 3 (doc. 13). Accordingly, the Court construes plaintiff's appeal as a challenge to the ALJ's treatment of her subjective symptom testimony.

Page 3 – OPINION AND ORDER

severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281 (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, plaintiff testified she was unable to work due to "a lot of problems, like hurting and getting out of bed and stuff like that." Tr. 44. Plaintiff explained that she lost her caregiving job in 2017 due to interpersonal circumstances that caused extreme depression; when she "finally came out of that depression," she realized that her physical health had deteriorated:

> sometimes it was, you know, hard to lift things. And my back was constantly burning and hurting. And, you know, it started out with small stuff like that. And then I started having bouts where, you know, I thought I was having asthma attacks [which turned out to be chronic obstructive pulmonary disease]. And that's why I was having a hard time breathing and stuff. And so, it just kind of declined from there . . . to the point where it's -- I almost can't do anything now, by myself.

Page 4 – OPINION AND ORDER

Tr. 44-45.

Concerning her specific symptoms, plaintiff reported that her knees hurt "constantly" and she can no longer walk or stand up from a sitting position independently because she is "wobbly" and afraid of falling – so she either uses a walker or has to "have somebody." Tr. 45-46. Plaintiff also endorsed shortness of breath "[a]ll the time," even sometimes just from talking. Tr. 47-48. She testified that she needed to rest for several minutes, sometimes longer depending on the day, after any activity, even just walking from the living room to the dining room. Tr. 48. Regarding fatigue, plaintiff testified that she "always feel[s] exhausted" and "weak" but it "really depends on how much sleep [she gets] at night." Tr. 49. Due to poor nighttime sleep, plaintiff explained: "a lot of times, I'll end up dozing in the middle of the day." *Id.*

In terms of daily activities, plaintiff stated: "I can't do any of it. I have to have help . . . I do try to help. But a lot of times, have to give up because I can't do it, or I get too in the way, you know." Tr. 49-50. She testified that she goes to the grocery store and rides in a motorized cart, while her daughter and fiancé load items into it; they subsequently unload the items from the car and place them in the pantry. Tr. 51. Plaintiff did acknowledge having earnings from a newspaper delivery route in 2019, but explained: "it wasn't actually just me. It was in my name because I was the driver [but it also involved] my fiancé, and my oldest daughter." Tr. 42-43.

In terms of functional abilities, plaintiff testified that she could only stand for 10 to 15 minutes before needing to change position due to pain, and spends "most of the day" sitting or lying down. Tr. 46-47, 51. Even while sitting, she is "constantly having . . . to reposition" and stands up "probably like once every hour, hour and a half." Tr. 52-53. In response to a question from her attorney about whether she ever elevates her legs, plaintiff responded: "sometimes. Yes . . . I try very hard to do it between -- for at least 15 minutes, sometimes a half hour." Tr. 53.

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 19. In particular, the ALJ cited to the objective medical record, as well as plaintiff's history of conservative treatment and daily activities. Tr. 19-26.

Concerning the latter, the ALJ noted plaintiff's activities – i.e., performing household chores, caring for her children and dogs, delivering newspapers, driving, and managing personal finances – were "fairly robust" and served as "strong evidence that [her] impairments are not as debilitating as she alleges." Tr. 26-27. "Even where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (superseded by statute on other grounds).

Substantial evidence supports the ALJ's determination as to this issue. For instance, plaintiff's "Adult Function Report" from June 2018 demonstrates that she drove approximately 120 miles each day transporting her boyfriend and his roommate to and from their worksite in Woodburn (approximately 30 miles one-way from plaintiff's residence in Stayton, Oregon). Tr. 260, 266. Plaintiff also reported cooking simple meals, caring for her pets and daughter,[4] doing light chores such as laundry or the dishes, watching television, listening to music, and socializing. Tr. 260-63; *see also* Tr. 281-88 ("Third Party Adult Function Report," completed by plaintiff's friend/neighbor in August 2018, describing an analogous slate of activities).

---

[4] Born in September 2003 and 2007, plaintiff's children were 14 and 10 as of the alleged onset date. *See, e.g.*, Tr. 1348.

Page 6 – OPINION AND ORDER

In March 2019, plaintiff told her primary care provider, Claire King, M.D., that "[s]he now has a newspaper route" from 1:30a.m. to 6:00a.m. Tr. 576-79. Plaintiff denoted that, after a month of daily deliveries, she started experiencing "an intermittently painful right knee (it bothers her at the end of the night, after she has gotten out of the car multiple times to throw papers onto the doorsteps of her clients)." Tr. 579. In April 2019, plaintiff sought care for a sore calf and back after slipping on some steps while delivering newspapers. Tr. 684-87, 702. Although there are scant references to plaintiff's daily activities thereafter, the evidence that exists tends to show that plaintiff engaged in a wider slate of activities than endorsed at the hearing. *See, e.g.*, Tr. 824-25, 1081. Thus, while plaintiff proffers a more favorable interpretation of this evidence, the ALJ's reasonable reading must nonetheless be upheld. See *Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)).

The ALJ also relied on plaintiff's "conservative" treatment history, which showed "improve[ment] with appropriate" care and a lack of objective findings indicative of more significant restrictions. Tr. 19-25. "[W]hether the alleged symptoms are consistent with the medical evidence" and the type and dosage of the claimant's medications are relevant considerations. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) (citations omitted). Similarly, "an unexplained, or inadequately explained, failure to seek treatment" is a clear and convincing reason to reject subjective symptom testimony. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An independent review of the record reveals that plaintiff's allegedly disabling knee pain appeared to be largely well-controlled with medication. As denoted above, plaintiff first reported

right knee pain in March 2019. However, this was not diagnosed as a chronic problem until she reported it had "been bothering her" for "3 weeks" in June 2019. *See, e.g.*, Tr. 683, 815, 875. Imaging from later that month revealed "moderate degenerative joint disease." Tr. 779. In August 2019, plaintiff began receiving steroid injections in her right knee (and subsequently in her left knee) every few months. The record generally reflects that these treatments produced "good results," such that plaintiff continued to obtain them through 2021. *See, e.g.*, Tr. 661, 1149, 1173, 1178, 1233, 1313; *see also* Tr. 667-70 (plaintiff stating in August 2019 that her last injection "helped her knee quite a bit"); 1021 (July 2021 right knee imaging showing "[s]imilar-appearing moderate chronic osteoarthritis"). There are no further treatment modalities referenced in the record except weight loss. *See* Tr. 679-80 (Dr. King instructing plaintiff that "even a little bit of weight loss would help considerably with her knee pain"); *see also* Tr. 866 (Dr. King denoting in her August 2021 "Physical Medical Source Statement" that plaintiff was not a candidate for "knee replacement surgery [due to] morbid obesity").

Regarding the allegedly overlooked symptom testimony[5] – plaintiff first reported fatigue in April 2019 to her neurologist, K. William Seeto, M.D. In particular, plaintiff stated she was experiencing poor nighttime sleep, such that she wakes up tired and "dozes off during the day if she watches television." Tr. 845. Plaintiff was instructed on good sleep hygiene and told to avoid driving and consider a sleep study if symptoms persisted. *Id.* Thereafter, Dr. Seeto continued to

---

[5] Plaintiff attempts to attribute her fatigue and lower extremity edema to impairments the ALJ found medically determinable and severe at step two. *See* Pl.'s Opening Br. 3 (doc. 13) ("osteoarthritis of the bilateral knees and obesity causes Plaintiff to experience lower extremity edema and profound fatigue . . . The ALJ acknowledged the fact that Plaintiff was diagnosed with lower extremity edema and fatigue, but failed to address [her relevant] testimony"). However, as discussed herein, while plaintiff had a number of other conditions that may have contributed to her fatigue and lower extremity edema – e.g., hypothyroidism, hypertension, obesity, etc. – the medical record reflects that those conditions were treated as distinct impairments and plaintiff does not challenge the ALJ's step two finding on appeal.

Page 8 – OPINION AND ORDER

instruct plaintiff on good sleep hygiene and to avoid driving "if sleepy or not feeling normal." Tr. 847, 860.

Plaintiff first sought treatment for swelling – specifically, in her hands and legs – in June 2019.[6] Tr. 680. There was no edema upon examination. Tr. 684. Dr. King reassured plaintiff that "[s]welling in the hands and feet is common during the warm summer months." *Id.*

In July 2020, Dr. Seeto noted that plaintiff "has sleep apnea" based on her constellation of symptoms "but has not been treated for it." Tr. 863.

In March 2021, plaintiff presented to Dr. King with concerns of fatigue. Tr. 1120. Plaintiff remarked "she has been feeling excessively tired . . . for a couple of months." Tr. 1125. At that time, she also complained of "swelling in the legs below the knees [that has] been going on for a couple of months." *Id.* "[N]o leg swelling [was] appreciated [upon] exam [and] a sleep medicine consult [was requested] to address the snoring and poor sleep at night." Tr. 1126-27. Follow-up bloodwork and cardiological studies were also ordered, which yielded normal results.

In May 2021, plaintiff underwent her sleep medicine consultation, during which she was referred to a sleep study to address her sleep apnea and "chaotic sleep cycle." Tr. 877-79. At that time, plaintiff denied any "history of sleepy driving" or "motor vehicle accident/near motor vehicle accidents," but did endorse taking 20-60 minute daily naps that were "refreshing." Tr. 877. Dr. King expressed hope that "many of [plaintiff's] complaints may improve with the correction of her probable sleep apnea." Tr. 1108. There is no indication that plaintiff subsequently underwent a sleep study.

---

[6] There is a single reference from shortly before the alleged onset date to plaintiff's feet, hands, and face swelling; at that time plaintiff had recently started a new housekeeping job and was "drinking a lot of water." Tr. 536-38.

Page 9 – OPINION AND ORDER

In August 2021, plaintiff sought treatment for bilateral hand and feet swelling. Tr. 1076. Plaintiff explained that she had been on her feet preparing for a river trip and then spent some time outside in the sun; "[t]he next day her legs were still really swollen . . . they stayed swollen until yesterday when the heat wave broke and the outside temperature was lower." Tr. 1081. Although "no swelling [was] appreciated in her hands or feet [upon] exam," a picture from a few days prior showed "her ankles [as] almost nonexistent." Tr. 1081-82. Dr. King again reassured plaintiff: "The leg swelling is a natural phenomenon – it is her body's attempt to stay cool when the temperature outside is so high . . . no worries!!" Tr. 1082 (ellipses in original); *see also* Tr. 1067-73 (Dr. King denoting five days later that plaintiff's lower extremity edema was "secondary to natural phenomenon of vasodilation of peripheral blood vessels in the body's attempt to stay cool and keep core temperature within safe range").

There are no other references in the record before the Court to either excessive daytime fatigue or lower extremity edema. As such, the ALJ reasonably inferred from this evidence that plaintiff's allegedly disabling impairments were not as limiting as alleged.[7]

In sum, the ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptoms statements.

---

[7] In addition to the light exertion jobs, the VE identified a significant number of sedentary exertion jobs that plaintiff could perform despite her impairments. Tr. 55-56; *see also* Tr. 29 ("born on December 31, 1973, [plaintiff] was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date"). The VE even indicated that these sedentary positions would accommodate the need to sit and stand at-will. Tr. 55-58. Plaintiff does not address or otherwise acknowledge these alternate occupations in her briefing. *See generally* Pl.'s Opening Br. (doc. 13); Pl.'s Reply Br. (doc. 16).

## CONCLUSION

For the reasons stated above, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 6th day of December, 2023.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

Page 11 – OPINION AND ORDER